May it please the court, Jagdeep Sekul on behalf of the petitioner Sajid Singh. Your Honor, first, if it pleases the court, I would like to review the factual context of the case. Petitioner Sajid Singh submitted himself to the asylum process in 1991 after he and his family arrived in the United States from Fiji. In 1991, he decided to submit himself to the asylum process as a derivative applicant instead of a principal applicant. He thus had an application that was filed, but he did so as a derivative. The principal applicant on that application was his mother. Thereafter, there were only two hearings that are at issue here. There is a July 1996 hearing and a May 1997 hearing. At the July 1996 hearing, the petitioner, through his counsel, as well as his mother and his brother, stated their intent to proceed with the asylum application that was on file. In addition, at that July 1996 hearing, which, Your Honor, actually constitutes sort of a scheduling hearing, at that July 1996 hearing, the potential of the mother securing legal permanent residence status under the INA Section 245 was also discussed, but there was no application at that time because she didn't qualify for the relief at that time. But, counsel, didn't that then put counsel for everyone on notice that it might be prudent to file independent applications at that point? For asylum, Your Honor? For asylum, yes, rather than derivative applications, filing applications independently for each of the brothers. Didn't that put the attorney on notice that that might be a prudent thing to do? Well, Your Honors, I don't know, Your Honor, because the only deadline that was set at that time was for the application for adjustment of status. So if it was so obvious, there would have been some discussion about it. And, moreover, the fact of the matter is the statute and the regulations encourage families to proceed together and expressly provide the right for a derivative to sequentially first seek asylum as a derivative, and then if for some reason they don't secure a decision on the merits of their asylum application, then thereafter they can apply its principles. But aren't there time constraints, though, that have to be considered in conjunction with that decision? Are you, Your Honor, referring to the one-year time bar, Your Honor? Right, because your client tried to get an extension of time, in essence, to file an independent application, right? No, Your Honor. Why are we here then? Why was he not allowed to file the independent application? Your Honor, I think that's the problem with the case. This case should not be before the court. If the immigration judge wanted to impose a time restriction, which is his authority to do so, he should have set a deadline. That is his instrument under the regulations. He has wide latitude to set deadlines. And does he have wide latitude to deny the filing of an independent application? He has zero authority to do so, Your Honor, unless he invokes some regulatory authority. And so your argument is that the immigration judge did not have the authority to deny the right to file a separate application? He had absolutely no authority, Your Honor, unless he invoked some regulatory. Now, what's your case authority that supports your argument? Well, Your Honor, you know, I have never ran across a case where an immigration judge denied the right of an alien to apply for asylum based on the fact that it was untimely without setting a deadline. So this is how – I think this is an extreme situation. There are a lot of cases, Your Honor, that we cite in our briefs with regard, you know, to an alien's right to be notified of the right to apply for asylum. And moreover, Your Honor, I think the statute is so unequivocal that an alien can file for asylum irrespective of his or her status. At any time? Well, Your Honor, I would like to – I do want to clarify what might be some confusion here because the one-year time bar – if you read the statute now, the INA under Section 208, there is a one-year time bar. And it's not – but it wasn't applicable to our case because it's a new law and you can – the one-year time bar only actually goes in effect after April of 1998. So the one-year time bar did not apply. But moreover, what's interesting here, because I'm glad Your Honor is asking these questions, is that the one-year time bar is – there's an express exception in the regulations applicable to the one-year time bar when there is a derivative who seeks to apply as a principal. They expressly exclude barring an alien who was a derivative to seek to apply. What regulation is that? Your Honor, Senator, I can refer you to the court. You brought the regs with me. But it's under – there are specific regulations that apply to the one-year time bar. There's a whole section under INA Section – sorry, ACFR 208, and I will provide the court with that regulation before closing today. But so – and I would like to maybe – on this point, the regulation in the statute give a lot of allowance to aliens who want to seek asylum as derivatives and not prejudicing them if they need to do so eventually as principals because there's a very strong policy here at issue, and that is to allow families to seek asylum together and, in fact, encourage them to do that without fear of any prejudice because we want the administrative agencies to be able to adjudicate these applications together. And so we encourage aliens to apply together. Otherwise, if they don't, then you're going to engage in piecemeal litigation because everybody's going to be, you know, wearing their suspenders and their belts, you know, because they'd be so worried, and then it's going to really burden the administrative agencies. So the allowance is there. At what point did the petitioner's mother know that her application for adjustment of status had been granted? At that hearing, Your Honor. At the second hearing. At the May 1997 hearing. That's an important point, that she – there's no deadline to file the asylum application as a principal. So this family – What do you mean there's no deadline to file an asylum application? There's a one-year deadline, right? Yes, Your Honor, but first of all, again, that's not applicable – that was not operating in this case. It is not applicable to this case because under the regs, the one-year deadline works like this. If that – it starts running from April of 1997 and one year from that point. So, yeah, so it would be every application after April 1998 or later. That's when you look at the one-year deadline. I would be curious as to the regulation you're relying upon for that. But let me just ask you this. The BIA treated the IJ's decision as the denial of a motion for continuance. Do you take issue with that characterization? Absolutely, Your Honor, because if you look at the whole – on two grounds. But I think maybe the factual basis that I should have maybe explicated more in the briefs that I did not was the fact that no one's discussing a continuance at the hearing. That's a mischaracterization. All they're talking about is when the application should have been filed. If you look at the discussion between the counsel – all the counsels, it's, you know, when the application should have been filed. And it appears from the transcript, and I think the transcript, in fact, suggests that they actually had their applications there ready to file. There's no evidence that they're saying, I need a date to act – a continuance to file the applications. What it seems to suggest is that the practical implication of them filing the applications on that date would have said they would have to be heard at a later date. Counsel, let me just ask you this. Under 8 CFR 1003.31, I don't think that there is a – that the I.J. is mandated to give a time period for the filing of an independent asylum application. Are you saying – I'm sorry, Your Honor. Are you saying that the I.J. is mandated to set a deadline for the filing of an independent asylum application from one who was previously a derivative? Okay. What I'm saying, Your Honor, is that an alien is entitled to apply – if he's a derivative, to seek asylum as a principle, if need be. If he doesn't – if he or she did not secure a decision on the merits of their asylum application, which this alien never did. Do you see any time limit to that? So for forever? Absolutely, Your Honor. All the immigration judge had to do was set a deadline. That's all he had to do. This case would not be before the court. But that's what I'm saying. I don't think the regulation requires the I.J. to set a deadline. If the regulation does not require the I.J. to set a deadline, then what authority do you rely upon to say that he erred in not setting one? Well, Your Honor, again, I think we have to look at that the alien has first a right to apply for asylum. The right is unqualified. In fact, under the regulations, the bar from filing for asylum on more than once, even that bar does not apply to an alien who's seeking to apply as a principle after first being a derivative. All right. Thank you. I understand your argument. Thank you, Your Honor. Thank you. Thank you, counsel. Good morning, Your Honors. My name is Jeffrey Bernstein. I represent the government. May it please the Court. The first thing I want to clear up is counsel's suggestion that the statute and regulations mandate a sequential filing of derivative and independent asylum applications. You might have said they permitted it or encouraged it. I believe he said that the statute and regulations provided for sequential. They do not. There is no bar in the statute. He said that families were encouraged to file together. Well, he said that as well. And that the one-year deadline didn't apply when someone who had applied derivatively subsequently applied independently, but that a deadline could be imposed by DIJ. Could you respond to that? That's how I understood him, what I understood him to be saying. So if you argue against something else, at least one of the three judges will take it as an argument with a straw man. Well, he was saying many things, and I don't know if I can respond. Why don't you just say your own piece on why it wasn't an unfair and why it wasn't an abuse of discretion. I will, Your Honor. Once the IJ said, okay, the asylum application by the mother is moot, not to give these fellows a week or a month or some reasonable period of time to file their independent application. I will, Your Honor. Mr. Singh's allegation that the immigration judge was required to set a schedule for asylum applications before denying a continuance is simply incorrect. No one asked for a continuance, did they? They did ask for a continuance, Your Honor. The record establishes that there was an off-the-record discussion, and then when the hearing resumed and at the end of the mother's adjustment of status proceedings, after the adjustment of status application was granted, the judge asked how they wished to proceed, and what page are you reading from?  And the judge says to Petitioner's trial counsel, what will the gentleman, meaning the two sons, be applying for? As we indicated off the record, we came here with the belief that they could file applications on their own and go forward at a later time on their asylum request. That's a continuance. They're asking, and let me say that there's no indication in the record that they have the applications ready at that point, but that's neither here nor there. So he was asking for a continuance. There's no question about it. He wished additional time. I don't understand that. I mean, if the word continuance isn't used and there hasn't been any deadline, I don't get it. You ask for a continuance when something is due Monday and you can't get it done Monday, so you get a continuance to Thursday or something. It was a continuance of the merits hearing. The merits hearing, which was set to determine the claims of all these individuals, was set for a date certain, at which time testimony was to be presented and all of the applications for relief were to be resolved. The hearing is the deadline. That's the deadline. At the master calendar hearing, the immigration judge determines what kind of relief the aliens might be seeking. I still don't get it. It seems to me the only thing that the children had pending as they approached that hearing was a derivative application for asylum based on the mother's application. Well, that's right. They were ready to go on that. They didn't need a continuance. Then at the hearing, the mother got to stay in the U.S. by a different route, which mooted out the son's application. So now what the sons needed to do was file a new application. As far as I can tell, the one-year deadline doesn't apply because it's going from derivative to principal. The one-year deadline doesn't apply. And I want to know why it isn't an abuse of discretion. I'm trying, Your Honor. It was a continuance. Again, the master calendar hearing, which counsel alluded to and explained quite properly, is an opportunity for the judge and the alien to understand what the case is about and what issues are going to be resolved at the merits hearing. And once the immigration judge has all that information, he determines how long a period of time the aliens will be given to do whatever they need to do to get ready for the hearing, to file asylum applications, to file applications for adjustment of status. And then he sets the hearing. And in this case, he set the hearing for ten months later. Again, at the master calendar hearing, the immigration judge was told that the mother wished to file for adjustment of status. And let me point out, at no time did any of the sons, either of the sons, indicate that they had a well-founded fear of persecution or a fear of persecution. The right to asylum and the obligation of the agency to provide for an asylum. Why would they? They were never allowed to apply for asylum. They were allowed to apply for asylum. The statute and regulations do not preclude a child of an asylum applicant to apply for asylum in their own state. They were allowed to, but there was no reason to if the mother had the stronger claim. Well, there was a reason to because at that very hearing, it was clear that she had an alternative avenue for relief. At that point, the sons, if they had a well-founded fear or a reasonable fear or proof that they had been persecuted in Fiji, were bound to then protect themselves by filing, by indicating that they wished to file applications for asylum as well in their own right, which they can do. They did not. And the immigration judge set the hearing ten months later for, number one, adjudication of the mother's asylum application, number two, adjudication of the mother's potential application for adjustment of status, which I might point out the record indicates that the Immigration and Naturalization Service indicated to the judge that the Immigration and Naturalization Service would be looking favorably upon the visa application and the application for adjustment of status. So they knew, they should have known that they should have protected themselves by filing an application for asylum. Does this mean, if we accept your argument, that anybody who is awaiting a derivative claim of asylum should also file an individual? If they feel that they have a basis for a non-frivolous basis, absolutely, Your Honor. It doesn't make sense if you have a non-frivolous basis for asylum not to apply for asylum, whether you're a derivative or not. Well, it does make sense. You've got to pay the lawyer another substantial chunk of money you probably don't have. Well, it seems to me that if you've got a family unit, they all come from the same country, the same circumstances, the one lawyer is going to do it all as the one lawyer did it all here. I don't think so. I don't think that's much of a burden. There's certainly no evidence that that was a burden in this case, Your Honor. So the immigration judge set the hearing for ten months later. The adjustment of status application was filed. The visa was granted, I think, in October of 1996, several months before the hearing. The adjustment of status application was filed. It was essentially fairly the parties could have been reasonably sure that this application was going to be granted. Did the petitioners indicate that they had a well-founded fear of persecution, that they had been persecuted? No. They didn't file applications at that point either. So you get to the hearing ten months later and a few months after the adjustment of status application is filed, and all of a sudden they say, well, we want to file an application for asylum and we're going to need more time. Well, the judge said, you've had all this time. You've had ten months. You should have filed your own application. It was perfectly reasonable for him to protect the court's calendar, to protect the interest in avoiding and to protect the system against aliens delaying the system, as the Supreme Court recognized they do. And it was in the interest of the court to protect other aliens who have justiciable claims before a limited core of immigration judges to have immigration judges available to hear their claim without being delayed by people who don't file asylum applications if they had a well-founded fear. There's no indication they ever had a well-founded fear. To prevent aliens from then going ten months later saying all of a sudden, well, I'd like to file my own application. I mean, that is not an abuse of discretion, Your Honors. That is an immigration judge protecting his calendar, protecting the immigration system from unjustifiable delay. The immigration judge did not abuse his discretion in denying this continuance. They did not phrase it as a continuance, but that was what it was. The immigration hearing was the deadline. That's when they should have been ready to present their case. And they didn't. I might add that the petitioner in this case has never alleged that he has a well-founded fear of persecution or that he was persecuted in the past. He did not raise that issue. You brought this up already. Well, can I just make one sentence? You're over your time. Thank you, counsel. Thank you, Your Honor. Thing v. INS is submitted. No, you used up your time. You may be receiving the citations. Oh, were you giving the citations? Yes, Your Honor. Yes, thank you. Thanks. There's one issue with the part. No, you didn't. Okay, it's 208. With regard to the time bar, the regs are 208.4. Is it 8 CFR? 8 CFR, 208.4, Roman numeral, small Roman numeral 1, C, big C. All right. Thank you. Thank you, counsel. Thank you. Next is Kreider v. Ashcroft. Good morning, Your Honors. Frank Sproul is appearing for petitioner. Let me start out by noting this case is blissfully free of facts. We are dealing specifically with statutory construction, congressional intent, and the difficulties I believe both practitioners and judges have with harmonizing these provisions, dealing with the derivative citizenship. What I'd like to start out with, which is where I started my argument, which is at 301 AC, and that's my contention that the petitioner is a citizen at birth based on a very plain reading of the statute. Again, we have to then reference what I call, for lack of a better term, the definitional section of the Act, which is 101. In this case, it defines what is a child and it defines what is a parent. Counsel for the government, and I don't think it disputes that he, both the adoptive parents here and the petitioner fit that definition. So starting from there, we then go to who are citizens at birth. And in this case, the parents are native-born United States citizens, and the petitioner is a child under that definition. He is a citizen at birth. Why is this important? Well, at his birth, he couldn't have been a citizen when he was born. Well, but the statute states that these parties are. The parent, he's the parent, because the adoption is sort of a non-pro-tunk, if you would. I'm saying that the language is very clear. He becomes a citizen by birth when he's later adopted. When he's later adopted, because 301 simply references the parent. I mean, there's a reason we have the definitional section, so you don't have to reinvent the wheel at every part of the Act. But, counsel, if you have a specific provision setting forth how adoptees become citizens, wouldn't that trump the general definitional section? If it did. But it doesn't. I mean, there's a section that we talked about where I think we're going to go into the equal protection argument. That's very different. There's the section 322, which the government references but they don't cite, that talks about adopted children, but it doesn't cover this particular situation. 322 deals with people who could have been foreign-born and ultimately became citizens. Or there's only one parent. That doesn't deal with our situation. What we have here at the end of the day is the rather anomalous situation where native-born adoptive parents do not transmit the same rights as alien parents do. I submit Congress either didn't intend that or if they did, it's an equal protection violation. And I'm getting ahead of myself in terms of equal protection. Counsel, I'm having trouble fitting in the definitional arguments. I look at 301C and it says a person born outside the United States of parents, both of whom are citizens of the United States, and one of whom has had a residence in the United States prior to the birth, shall be a citizen of the United States at birth. What strikes me there is two things. First of all, it doesn't say a child of parents who are U.S. citizens is a U.S. citizen at birth. It says a person rather than a child. And it says of the person born of parents. They are his parents because of the adoption, but he wasn't born of them because he's adoptive rather than the biological child. Right. Although the statute does reference parent, and a parent is defined as a person who adopts a child under the age of 16. So I think there is a cross-reference. But he still wasn't born of those parents. There's a different provision for adoptive children. I'm really looking for a way to deal with this because your equities are so compelling and it just seems a terrible shame to send this kid back to Brazil. But it looks as though they worded the statute so that if you adopt a kid from a foreign country, you get him a citizenship before he's 18. Right. Although I understand that. But the 322 doesn't specifically deal, it deals with a different scenario. The 322 section, the parents don't have to be native born. You can have a whole constellation of other scenarios. Here we have, when I think you correctly identify, a very compelling case. And I think that's where we have to, and maybe I'll leap right into the equal protection argument. You sure do have a compelling case. Before you get to equal protection, that's always real weak in immigration cases. Help me deal with the born of problem that I have. Very simple, if I could. In terms of harmonizing this whole statute, again, by definition we're talking about children, i.e. these are citizens at birth. So I think by necessary statutory construction, we're talking about children and parents. We're referencing the term parent. The definitional section deals with parent. I see the problem born of, but we're still dealing with parent and child. So we have, again, I think we have to then go back to the definitional section. And a child, we're dealing with children here in 301. There's no question. Right. These are citizens at birth. Not to be flippant, you're a child at birth. So clearly, I think we still have to reference the parent and child. Otherwise, we end up in the anomalous situation that we have here. And again, the other section that deals with adoptees deals with scenarios where the parties and the applicants are not necessarily native born. So I think Congress was trying to harmonize all this. 322 deals with, you know, they could have been foreign born, ultimately became citizens. The child also has to be a lawful permanent resident. Here, that doesn't have to be the case. So that, I think, if you try to harmonize them all, you, you know, statutes shouldn't be construed to produce absurd and, I think, wildly unfair results. So I think in order to harmonize that, I think we – I'd like to start with the he's a citizen at birth. And I know it's a quirky look on your face, Your Honor, and I know it's very difficult. I'm thinking the same thing that Judge Canby was thinking. He wasn't a U.S. citizen at birth. He was Brazilian. The course that was supposed to be followed was for his parents, after they adopted him at age 15, to get him a citizenship before he turned 18. And they didn't. And I'm trying to – and as I understand the scheme, the reason the child born of citizen parents is a citizen at birth, even though he was born abroad, is to do with born of citizen parents. Right. The section of the deals with the adoptees also has a provision that the adoptive child must also be a lawful permanent resident. Now, in our case, he happens to be one, and that's why I'm also arguing under 321, 322. But to harmonize 301 and 322, you could have the situation where the – you know, 322, which deals specifically with adoptive children, the adoptive child must be a lawful permanent resident on the triggering date, which is before the 18th birthday, and the parents have to file an affirmative application. 301 doesn't have that. If you are native-born United States citizens and you want to adopt a child, make that child a part of your family, he need not be a lawful permanent resident to be a citizen at birth under my reading of the statute. So I think to say that 322 covers the entire constellation of adoptive United States citizens and parents and them transmitting citizenship to their adoptive children doesn't – isn't fully satisfying. It doesn't cover every contingency. So I think we also have to agree occasionally these immigration statutes are not models of clarity, so I think we are required to harmonize them. And I think if you take the government's position, we end up with what I think everyone agrees is anomalous. It is rather odd. Counsel, if the statutes are ambiguous, don't we defer to the BIA's reasonable interpretation? Well, there's two schools of thought. Doubts and ambiguities should also occasionally be – there's cases that should be resolved in favor of the alien, and they should certainly be resolved in favor of, for lack of a better term, ameliorative statutes. And these are statutes that are trying to benefit both native-born United States citizens. So I think it cuts both ways. It does cut both ways, and I recognize the Chevron deference argument, but there is a counterargument that very ambiguous statutes, the rule of leniency and the like, that I think in a case like this it would be appropriate to err on the side of the United States citizen parents, native-born. So, again, I'm starting with 301. If my interpretation is right, we need not get to the more difficult legal protection argument, and we end up with a scenario where, again, native-born citizens are going to be, not surprisingly, treated somewhat better than one alien and one citizen parent. Obviously, there's deeper ties when you're native-born. So having said that, that's my argument in 301. We don't need to get to equal protection if he's a citizen at birth. But judging by the looks on some of your faces, perhaps I need to get to the next one, because that's also, you know, assuming arguendo he's not a citizen at birth, then we'd have to go to the next argument, and that, of course, is equal protection, that if this is the law, to quote Charles Dickens, and the law is, you know, the law is not proper, that Congress couldn't have intended it. And if they did, this is one of those rare, minimal scrutiny, equal protection arguments. On equal protection, I have a couple problems. One is that the Supreme Court has said over and over again that Congress has plenary authority in this area. And the other is that in Miller, I think it was Miller, the Supreme Court said that Congress has good reasons for drawing distinctions between children of American citizen fathers and children of American citizen mothers. And I wonder if it couldn't have equally good reasons for drawing the distinctions it does here between natural and adopted and adopted by age 16 and so forth. Sure. I think I could distinguish those. I mean, Miller basically dealt with the – I mean, the argument was that it relied on outmoded gender stereotypes, but the argument was they had a very good reason in terms of identifying legitimate versus illegitimate children. Here, there's no such difficulty. The question is we're simply leaving out the adoptive children of native-born citizens. I mean, there's no – you know, I mean, the argument of the government is that somehow the reason is better to treat the adoptive child of the lawful permanent resident because they go through the prompting ceremony of the naturalization ceremony, and that will instill a greater fealty to the United States. I don't think that's the best argument that they've made. And again, this Court hasn't hesitated. We – you know, there are instances where equal protection violations are found in immigration statutes. I mean, in Graberdeen v. INS, this Court found that the distinction between two first-time narcotic offenders violates the Equal Protection Act, that a State statute is not – is not afforded the same way as the Federal. So they have to be repowered, but when it is truly doesn't meet minimal scrutiny, the courts have not hesitated to intervene. I mean, the only argument the government could make, it would say, assuming Congress attended this, the reason they wanted to benefit the native – the alien parent and the adoptive child was they would share the naturalization experience. I've been to those ceremonies. They're very nice. But I – one, the child could have been five years old when it happened. I mean, I don't think that cuts it. I mean, that's the only argument preferred by the government, that the adoptive child of the citizens, they just sort of get it. If they're granted, they won't go through this civic experience. I don't think that's the strongest argument. If you're talking about minimal scrutiny, again, what you have is the native-born citizens not being able to transmit citizenship to the child that they've adopted, under the age of 16, obviously as a child, made part of their home. So I understand equal protection is often weak, but it's not toothless. I mean, this Court does occasionally step in and say, this is irrational. And I think that's where we are. And if I have a few more moments, I think I do. Thank you, counsel. Thank you. May it please the Court, and good morning.  Mr. Crider is in removal proceedings because he committed a drug offense, and the Immigration Court concluded he's not a citizen. Thus, if the Court finds he is not a citizen, as it should, the Court must dismiss the petition for review for lack of jurisdiction. It seems clear to me that Mr. Crider is not a citizen pursuant to Section 301C. As Judge Kleinfeld indicated, the statutory language indicates, doesn't indicate it says, that the individual has to be born of. Mr. Crider was adopted. He was not born of his parents, of his United States citizen parents. So 301C doesn't apply. And as Petitioner's Counsel indicated, even if you find that it's ambiguous, the Board of Immigration Appeals is charged with the construction of these statutes, and you owe deference to them. And their determination that what I just said was correct is certainly reasonable, and it must be deferred to. And, again, you do have the problem, reading it the way Mr. Crider reads it, that it does render Section 322 superfluous. And courts are loathe to find provisions of the statute superfluous. Thus, because the statute is clear and Mr. Crider can't obtain automatic citizenship under 1401 or any other provision, his parents would have had to have filed a certificate of naturalization, and he would have had to have taken the oath. That raises four questions that this Court must resolve. If it deals with the equal protection argument. The first question is whether he may or Mr. Crider may assert a constitutional infirmity in the statutory scheme which precludes his adoptive parents from conferring citizenship upon him as easily as can an alien adoptive parent pursuant to Section 320 of the Immigration Nationality. If so, then what is the standard? If he can raise a constitutional infirmity, what's the standard that the Court looks to? And then whether or not the Congress's action satisfies that standard. And if it does not satisfy the standard, what is Mr. Crider's remedy? Well, there are two reasons why the Court, why he may not assert a constitutional infirmity. And the first reason, first or second, I guess they're interchangeable, he doesn't have standing. He doesn't have standing to do so. Well, you don't think he's injured? He doesn't have standing. His injury, he doesn't have injury resulting from the ostensible distinction. Here it is. He's not within the zone of the statutory distinction. The Congress, when it said that, when it provided for citizenship for children of, when there's a naturalization and so on, wasn't thinking of the child at all. Apparently not. It was, I mean, I don't know if it was or not, but that wasn't operative. What was operative to Congress was in what situation may a parent confer citizenship. This is the parent's right to confer citizenship. It's not the alien's right. You are ignoring, as they have told us to, Bush against Gore, I gather, where you can raise other people's equal protection arguments. I'm sorry, Your Honor, I'm not following. I'm sure that's my fault. Well, I was saying you are ignoring, I suppose, as we've been told to do, Bush against Gore. You don't have to be in any zone to raise somebody else's equal protection. Well, to be honest with you, I'm not familiar enough with Bush versus Gore to respond to that. And if the court wishes additional briefing. Take a look at it and figure out whose equal protection rights are being violated. Well, I think the court would recognize that Bush versus Gore was an extremely unusual case with an extremely unusual circumstance. Okay, but it does, I mean, there it is, an equal protection standing that seems to me may well have been liberalized by it. But I have really a hard time saying that the child is not within the zone of protection when Congress passes an act for conferring citizenship on children in certain circumstances. And he's claiming that he would be eligible for that. I don't know. I can see other problems with the equal protection thing, which I'm sure you're going to get to. Yes, Your Honor. Yes, Your Honor, I will. Counsel, let me ask you this. In terms of the normal deference to the BIA's interpretation of a statute, is that different when it's a citizenship determination that's at issue? No, Your Honor. Well, how do you account for our Holden and Hughes versus Ashcroft, where we said that citizenship determinations under statutory interpretation are done de novo? Well, that's application of the statute in a naturalization proceeding. This is not a naturalization proceeding. This is a removal proceeding brought about by, well, removal proceeding in which Mr. Crider says he's not removable because he's a citizen. You have to be an alien in order to be removable because if you're a citizen, obviously the government can't remove you. The second reason that Mr. Crider ---- What was your distinction, though, between Hughes and our case? What's your distinction? To be honest with you, I'm not intimately familiar with Hughes, but from your description it sounded like Hughes was an appeal from denial of naturalization. No, it's removal. It's a removal case. I'm not familiar with Hughes, I'm sorry. All right. Again, if the court wishes me to brief that issue. No, that's all right. I'm happy to do so. The explanation I think that you gave for the government's getting for the difference, we've got a situation where a parent is being naturalized, and that gives citizenship to the child, the minor child. But one who's already a citizenship, the adoption doesn't. If I understand correctly, the argument of your point is we've got a situation where the statutes provide for citizenship to be conferred on an adopted child when the parent, when one parent's a citizen and the other one's being naturalized, I think it is? Yes. When one citizen is a parent and the other individual is an alien, and that alien naturalizes, then the child, subject to certain exceptions, becomes a citizen automatically. Right. And he's saying that it's irrational to do that and provide that an adopted child of people, both of whom are already citizens, doesn't get citizenship. I understand your question, Your Honor, and that really leads me into the point that I was about to make before you questioned me, and that is that the Supreme Court has held in Landon v. Placentio, Heracliades v. Shaughnessy, and Fialo v. Bell in particular, that Congress's line drawing with respect to, certainly, entry is virtually unreviewable. In Fialo v. Bell, the Supreme Court said, There is no judicial authority to substitute our political judgment for that of Congress's. This court in Price held that in the naturalization context, those interests are at least as strong in naturalization as they are in entry and Congress's ability to determine who can come into the country. So, as I say, in Fialo, the court held that courts simply cannot review to the line drawing that Congress makes, and that's applied to naturalization because, as this court held in Price, naturalization and exclusion are both matters which are uniquely political. And I think Justice Scalia, in Miller v. Albright, does a wonderful job of explaining why that is, and I certainly don't want, I wouldn't try to improve on that. So then Congress could say that adopted children who are black can't become citizens, but adopted children who are not black can become citizens. Well, we can't review that. I don't believe so, Your Honor. If Congress did do something like that with the Chinese Exclusion Act, didn't it? It selected by race and said no to people of one race. And I believe the Supreme Court upheld that in the Chinese exclusion cases. That's my recollection. That's my recollection, Your Honor. So, again, the answer to the question is whether or not he has a, may assert a constitutional affirmative is no. However, if the Court concludes that he can assert a constitutional affirmative, the question is, what is the standard? And the standard, as elucidated in Fialo v. Bell, is facial eligibility, facially legitimate and bona fide. It's not rational basis. I know this Court in certain decisions has equated facially legitimate and bona fide with rational basis. But I don't think the Supreme, I don't think this Court can trump the Supreme Court on that. In Fialo, the Court did not apply the facially legitimate and bona fide standard as a rational basis. In fact, in Fialo, the Court said it is not the judicial role to probe and test the justifications for Congress's determination. Do you have anything to say about our post-Miller decision in Ahumada Aguilar? Only, Your Honor, that your dissent indicated that the petitioner did not have standing to assert. I thought I was absolutely right, but it was a dissent. We think you're absolutely right as well, Your Honor. Obviously, that case was sentenced. That carries the implication, unfortunate for you, that the law of the circuit is wrong. And I'm wondering how to distinguish that case. Well, I mean, number one, the case doesn't exist anymore because the Supreme Court vacated it, I believe, and then sent it back. And then you wrote another dissent, as I recall, on a different, on a wholly different issue. Oh, yes. I think you're right. So that's simply not precedent. So the standard is facially legitimate and bona fide. And certainly there is no, nothing in this distinction which is not, which indicates that it's facially illegitimate. There doesn't appear to be a facial illegitimacy with Congress's particular line drawing in this case. It determined simply that U.S. citizen parents of an adopted foreign-born child had to go through one extra step. Or actually not, it's not really that they had to go through an extra step. It's that there are certain circumstances where citizen, where a United States citizen parents who adopt a foreign-born cannot naturalize, have their children naturalized in situations where an alien who becomes a naturalized citizen can. There is no. Could you go ahead and give a reason, pretend you're a rational congressman, and just give a reason, the sort of thing that might be plugged into a decision, if we wrote one, that went this way and gave a reason, why Congress would say if both the parents are American citizens, they have to get the kid naturalized, but if one of them is an alien and becomes naturalized himself or herself, they don't have to get the kid naturalized. Go ahead and give me some kind of sensible reason why a sensible congressman would say that. Right. Well, number one, we take, and I understand you understand this, but I just want to say it again. Number one, we take the position that it's the facially illegitimate. I know all the other positions. Two justices in Miller say no standing. Two justices in Miller say courts can't naturalize people, so if there's a violation of equal protection, all it means is that more people are cut out, not that more people are let in. And two justices say, anyway, there was a rational basis. Right. I'm asking you from the point of view of the two justices who said we get past all that, but there's a rational basis. I understand. Give me a rational basis. If you might permit me, I'll just make one assertion before I do that. I also want to, in addition to the precedent you cited, Miller, the court in Fialo said that the standard is facially legitimate and bona fide with respect to entry exclusion matters, and this court in Price said that naturalization matters are just as immune or should be or just as important politically or just as involve political questions as much as. You already know that you don't have to make these points to me anyway. I understand. Because of the dissent in Ahumada Aguilar, and I'd really appreciate an answer to my question. I apologize, Your Honor. I just wanted to make that point. Maybe you could get to the question. I will, Your Honor. Yes. There are three that I've identified, and one is identified in our brief. And children of United States citizen parents have to go through the same naturalization process, essentially, as the alien parents do. When the alien parent does it, and the child obviously is of age, and I guess Congress made the determination that many, many, many, I don't know if majority, I don't know if the overwhelming majority, I don't know if some, but that the children that would obtain automatic citizens would be old enough to appreciate, observe the alien parent, preparing for the naturalization exam, going down to the district court to take the oath. And they wanted an alien child brought to the United States and adopted by United States parents to have the same benefit. In other words, to recognize that citizenship in the United States does not come cheap, that one must make effort, that it's a valuable right in order to make an effort. So ergo, the U.S. citizen parents are required by Congress, were required by Congress, it's changed now, were required by Congress to naturalize the child, to go through the process of submitting an application for naturalization and to have the child undergo the oath. So I think Congress wanted to even it out. Number two, Congress felt that the United States citizen parents should take an affirmative step, that all parents should take an affirmative step to ensure that the parent truly wants citizenship to be conferred. Obviously, the alien who becomes a naturalized citizen is taking that affirmative step. The alien who naturalizes with a child understands that her child will get automatic citizenship. By the same token, Congress wanted United States citizen parents to take that affirmative step. The alien parents become naturalized in part because they want their children to be citizens, and Congress felt that the U.S. citizen parents should do the same thing, should have a choice. The third one is, I believe, and this kind of more implicates, the first two implicate the domestic political issues, I suppose. The third reason implicates the international political implications. I think Congress wanted foreign countries losing citizen children through adoption to know that the United States citizens would simply not take, that we wouldn't make it easy for the child to give up the citizenship. So it wanted the parents to make the affirmative, take the affirmative step, not only to decide to make this child of a foreign country a citizen, but to demonstrate how much they wanted this child to become a citizen by having them do extra stuff. So those are at least three bases which are certainly rational, if the court were to determine that it must apply the rational basis test if it gets to that question in the first place. And I think the Child Citizenship Act, which now allows United States citizen parents of adopted foreign-born children, the foreign-born children are subject to a lot of conditions which I won't get into, are essentially citizens when they're brought into the United States. And Congress, again, made a political decision with respect to that. They decided to draw the line utilizing their political determination, their authority to determine political issues. They made a political choice to ease the burden of adopted parents who've already had difficulty, United States citizen adopted parents who had already had difficulty in adopting from and the difficulty and expense in adopting foreign country individuals from foreign countries. So that was a political decision. It really does illustrate that naturalization is political. What did you call the act? What did you call that act? The Child Citizenship Act of 2000. My last point, if I may. Your time has expired. Thank you, Your Honor. Thank you, Counsel. Very briefly, Your Honor. In terms of the threshold of equal protection and in terms of injury to creditor without being flippant, he's been in an orange jumpsuit and in custody for two and a half years based on the distinction that Congress drew. Our argument is that proceedings should be terminated because we're not in the business of deporting citizens. So there's a profound injury. Again, in terms of non-reviewability, I think the government goes a little too far. Some members may disagree. There is review, again. Any argument that would end up by saying you can distinguish between, you know, an African versus a Chinese versus a blue-eyed versus a green-eyed, if that is unreviewable, something's wrong at root with the argument. So I would just submit that the ---- I have trouble ever since Congress passed the Chinese Exclusion Act with seeing much sense to who's let in and who's not let in, but it's just not up to us as I understand it. Well, first of all, I mean, arguably one of the most disfavored bits of legislation in our history, and there's been subsequent law that says no, that we ---- the difference between exclusion and deportation, the idea of the rights that a person has at entry to the United States, is not coextensive with the rights, the distinctions that are drawn between citizens. And this Court, if we go back a little bit to Tapia, Okuna, and the 212C eligibility of lawful permanent residents who could get relief, this Court said that in a strange way that people who were at entry, who were excludable, could get that relief and deportable aliens could not. This Court said that's irrational. So it's not ---- this idea that it's utterly unreviewable isn't congruent with the ---- The Chinese Exclusion Acts were handed down before we understood that there's an equal protection component to the Due Process Clause. I question the relevancy of the Chinese Exclusion Act to the year 2003. Well, let's be a little more modern then. We still have different law for Cubans and for Romanians, right? Nicaraguans versus El Salvadorans, you know. But I don't think that ends the analysis. Sure, Congress can draw lines. I mean, they ---- eligibility, petitioning. That doesn't mean it's unreviewable. It doesn't ---- you know, to quote, I forget the case, Justice Brenner, deference is not abdication. There are times the Court can intervene. And I think we ---- I respectfully don't find the ---- you know, if there was a rational basis ---- How do you get around the problem in Miller? Two justices said there's no standing of the child, if I'm remembering it correctly. The child doesn't even have standing to make an equal protection claim because it's his parents, in that case the father, who have whatever claim there is. That's who the discrimination was against. And then two justices said even if it's a denial of equal protection, all we can do then is strike the law that lets some people get citizenship. We can't ---- Be more inclusive. Be more inclusive and allow citizenship to people that Congress chose not to allow it to. So it only leaves two justices out of nine who would even consider ---- well, no, it leaves five out of nine who would even consider the equal protection argument on the merits. Well, like I said, we counter by saying there's only two who say it's unreviewable in that case. So, I mean, I think the notion ---- it's not altogether clear. So, I mean, if two justices said we can get there, I mean, ultimately the decision was it was rational. So, I mean, I'm not sure that the state of the law is ---- if two justices say there's literally no review. And two justices say in terms of the remedy, they're admitting there's a remedy, but the remedy can only be to exclude, not to include, in order to remedy that equal protection argument. Two say, yes, clearly the equal protection clause is implicated, but Congress had in this case, I would even argue, a fairly rational basis. So I'm not sure that we're completely foreclosed based on that split, because here we are in a very different arena, I believe, than legitimate versus illegitimate. Here we are, again, I think, in somewhat uncharted water. I mean, it is unprecedented in our jurisprudence when native-born parents and the government did concede that really, in many ways, it is their right. They transmit this enormous benefit. Why is your ---- why is this statute any more irrational than the one in Miller? Well, because in Miller they could, you know, the argument was ---- But there is a child of an American-born, American citizen father, and he's not an American citizen. Well, because they were saying in order to ---- there's a question of paternity, and the idea was that it's easier with the mother than the father. I'm not sure I ever agreed with their reasoning, but they said there was sort of an evidentiary reason to make that distinction. And that was explicit. And there was, you know, statutes well before that that dealt with that distinction between legitimate and illegitimate children, and could the ---- it's easier to determine the biological mother of illegitimate children than legitimate. So in many ways it turned on ---- it's just easier to identify. Here we don't have any of that problem. We have to, I think, go into mental gymnastics and talk about the glory of denaturalization ceremony for the local permanent resident who becomes a citizen. And I think that's the distinction, that in terms of Miller, they had, in many ways, an evidentiary reason. They said it's easier to identify. And that was the rational basis. Here, I think we are not ---- if we agree that Congress intended it, it's an elusive rationale. I don't see it. And if one exists, I submit it doesn't withstand constitutional scrutiny. Roberts. Thank you, counsel.
judges: Canby, Kleinfeld, Rawlinson